UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br>vs.<br>ANTWAN FORTENBERRY,<br>    Defendant. | Case No. 2:14-cr-00387-JAD-NJK<br><br>REPORT & RECOMMENDATION<br><br>(Docket No. 33) |

This matter was referred to the undersigned Magistrate Judge on Defendant Antwan Fortenberry's Motion to Suppress Evidence. Docket No. 33. On May 6, 2015, and July 6, 2015, the Court held an evidentiary hearing on Defendant's motion. Docket Nos. 66, 94. The Court has considered Defendant's Motion, the United States' Response, the evidence adduced at the evidentiary hearing on this matter, and the parties' arguments. Docket Nos. 33, 37, 66, 94.[1] No reply was filed. *See* Docket.

**I.    BACKGROUND**

  **A.    Testimony of Detective Segura**

On October 6, 2014, Las Vegas Metropolitan Police Department (LVMPD) Vice Unit Detectives John Segura and Joseph Novotni conducted an investigation into an escort advertisement posted online at Backpage.com. Hearing Tr. (5/6/2015) at 1:55 p.m. The ad used the term "have fun," which Detective Segura testified, based on his training and experience, was code for sex. Hearing Tr. (5/6/2015) at 1:55 p.m. At approximately 1:00 a.m., Detective Segura responded to the advertisement in an undercover capacity, by calling the telephone number listed and arranging to

---

[1] Citations to the recording of the hearing are noted by "Hearing Tr." followed by the relevant date and time of the hearing, as no written transcript has been prepared.

1  meet with a woman who was later identified as Dinah Villasana at the Gustav bar, located in the
2  center of the Paris Hotel and Casino. Hearing Tr. (5/6/2015) at 1:55-1:56 p.m. Detective Segura
3  assumed, based on the ad and its language, that Villasana was coming to meet him for the purpose
4  of engaging in acts of prostitution, i.e., sex for money. Hearing Tr. (7/6/2015) at 10:27 a.m.

5  Prior to meeting Villasana, Detective Segura participated in a briefing that included Detective
6  Novotni, LVMPD Vice Unit Sergeant Brian Hibbetts, and two United States Secret Service (USSS)
7  agents from California. Hearing Tr. (7/6/2015) at 10:11-10:13 a.m. During the briefing, Detective
8  Segura was given Villasana's Backpage ad and a picture of Defendant Antwan Fortenberry, whose
9  name was mentioned as a target for whom they were looking during the undercover operation.
10 Hearing Tr. (7/6/2015) at 10:15-10:16 a.m. After Detective Segura left the briefing, he went to his
11 car and called Villasana to set up the meeting. Hearing Tr. (7/6/2015) at 10:16 a.m. He then gave
12 the Backpage ad and the picture of Defendant to Sergeant Hibbetts before heading inside the hotel
13 to meet Villasana. Hearing Tr. (7/6/2015) at 10:17 a.m.

14 When Villasana arrived at the bar, Detective Segura introduced himself as Steve from
15 Chicago and told her he was in town to have some fun. He also told Villasana that he would like her
16 to come up to his hotel room, and the two agreed upon a price of $600 for sex. Hearing Tr.
17 (5/6/2015) at 1:56 p.m.[2] They left the bar and headed toward the elevators, where Detective Segura
18 identified himself as a police officer and, at approximately 1:35 a.m., took Villasana into custody
19 for solicitation of prostitution. Hearing Tr. (5/6/2015) at 1:56-1:57 p.m.; Hearing Tr. (7/6/2015) at
20 10:16 a.m. Detective Segura arrested Villasana because, at the bar, she agreed to have sex with him
21 for money. Hearing Tr. (7/6/2015) at 10:33 a.m. Detective Segura relayed this information to
22 Detective Novotni and Sergeant Hibbetts. Hearing Tr. (5/6/2015) at 1:57 p.m.

23 . . . .
24 . . . .
25 . . . .
26

27    [2]Prior to Villasana's arrival at the bar, the word "sex" was never mentioned, only the word
   "fun." In Detective Segura's experience, people who post prostitution ads on Backpage use code
28 words. Hearing Tr. (7/6/2015) at 10:27-10:29 a.m.

## B. Testimony of Sergeant Hibbetts

Sergeant Hibbetts testified that he first became aware of Defendant approximately two months prior to the October 6, 2014, undercover operation, when a USSS agent informed him that Defendant may be involved in pimping. Hearing Tr. (7/6/2015) at 10:37-10:39 a.m.; 11:02 a.m. After the initial contact, Sergeant Hibbetts ran a Triple I check on Defendant and learned that he had a 2012 arrest in California for carrying a concealed weapon in a vehicle and possession of a weapon by a prohibited person.[3] Hearing Tr. (7/6/2015) at 10:40 a.m. The USSS agent also supplied Sergeant Hibbetts with a photo of Defendant, a photo of the silver Infiniti[4] he was known to drive, and the names of Dinah Villasana and Daejanique Benjamin as two prostitutes who worked for Defendant. Hearing Tr. (7/6/2015) at 10:45-10:48 a.m.; 10:50-10:51 a.m.; 11:17-11:18 a.m. Sergeant Hibbetts determined that his unit had arrested Villasana on the Tropicana track[5] on August 19, 2014, for soliciting prostitution. Hearing Tr. (7/6/2015) at 10:47 a.m.; 11:17 a.m. Additionally, Benjamin was arrested by his unit for soliciting prostitution between August and October, 2014. Hearing Tr. (7/6/2015) at 10:48 a.m. Sergeant Hibbetts, along with USSS agents, viewed the MGM's surveillance video[6] from the date that Benjamin was arrested for prostitution, which revealed a silver Infiniti SUV, whose driver he could not see in the video, dropping Benjamin off at the MGM.[7] Hearing Tr. (7/6/2015) at 10:49-10:51 a.m.; 11:19 a.m.-11:20 a.m. Sergeant Hibbetts

---

[3] Defendant was never convicted of these charges. Instead, the Triple I indicates that his probation was revoked instead. Exhibit 6.

[4] Sergeant Hibbetts testified that the colors grey and silver are interchangeable to him, and used them both to describe the vehicle. Hearing Tr. (7/6/2015) at 11:49 a.m.

[5] Sergeant Hibbetts explained that a track is a street venue for prostitution. Hearing Tr. (7/6/2015) at 11:10 a.m.

[6] The Court denied Defendant's motion to strike this testimony since LVMPD did not preserve MGM's surveillance tape. Hearing Tr. (7/6/2015) at 10:56-10:57 a.m. The government's duty to preserve evidence arises when the evidence "possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984). "Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

[7] Sergeant Hibbetts testified that the vehicle that dropped Benjamin off at the MGM appeared to be the same type and color as the vehicle Defendant was driving when he dropped Villasana off

1  testified that he relayed all of this information to his team as part of the October 6, 2014 briefing at
2  the Paris hotel. Hearing Tr. (7/6/2015) at 11:44 a.m.

3  Sergeant Hibbetts testified that USSS agents asked LVMPD to conduct the undercover
4  investigation that occurred on October 6, 2014. Hearing Tr. (7/6/2015) at 11:07 a.m. USSS agents
5  did not take any enforcement action in the operation but, rather, observed it. Hearing Tr. (7/6/2015)
6  at 11:07 a.m. Prior to the operation, the USSS had informed Hibbetts that USSS agents saw
7  Defendant drive two of his prostitute employees–Villasana and Benjamin–to Nevada from
8  California. Hearing Tr. (7/6/2015) at 11:08 a.m. The USSS told Sergeant Hibbetts that, because of
9  Defendant's actions in Nevada and California, they believed he may be involved in pimping.
10 Hearing Tr. (7/6/2015) at 11:09 a.m. The USSS told Sergeant Hibbetts that its agents saw Villasana
11 and Benjamin working on the track and that Defendant drove them to the track. Hearing Tr.
12 (7/6/2015) at 11:09 a.m. Villasana and Benjamin were seen getting into random cars on the
13 Tropicana track and going to hotels for short periods of time.[8] Hearing Tr. (7/6/2015) at 11:10-11:11
14 a.m.

15 On October 6, 2014, after receiving information that Detective Segura had arrested Villasana
16 for prostitution, Sergeant Hibbetts contacted Dispatch and asked it to send patrol officers to make
17 contact with the driver of a silver Infiniti parked at the Gold Key shops, approximately a mile and
18 a half from the Paris hotel, and said he had probable cause for arrest. Hearing Tr. (7/6/2015) at
19 10:53-10:54 a.m.; 11:26 a.m.; 11:44 a.m. Sergeant Hibbetts knew where the vehicle was parked
20 because of Detective Novotni's surveillance of it. Hearing Tr. (7/6/2015) at 10:54 a.m.; 11:25 a.m.
21 Sergeant Hibbetts knew, prior to October 6, 2014, that Defendant was an ex-felon. Hearing Tr.
22 (7/6/2015) at 10:54 a.m. Sergeant Hibbetts also told Dispatch that Defendant had priors for
23 weapons, it was unknown if he currently had any with him, and that none had been seen. When

---

at the Paris on October 6, 2014. Hearing Tr. (7/6/2015) at 10:57 a.m.; 11:18 a.m. Neither vehicle displayed a front license plate. Hearing Tr. (7/6/2015) at 11:19 a.m.

[8]Sergeant Hibbetts testified that it is common for a pimp to drop his prostitute on a track, and sit a short distance away to observe the actions of the prostitute. The prostitute then gets into a vehicle, then goes somewhere else–such as a hotel, parking lot or parking garage–and commit an act of prostitution. Hearing Tr. (7/6/2015) at 11:41 a.m.-11:43 a.m.

- 4 -

1  Sergeant Hibbetts made this request,[9] he based it on the totality of the information he had received
2  from the USSS, Villasana's August 2014 prostitution arrest, the prior arrest of Benjamin, and the
3  silver Infiniti dropping off Benjamin and Villasana. Sergeant Hibbetts had also received by that time
4  and relied upon Villasana's post-arrest statement on October 6, 2014, wherein she admitted to
5  soliciting prostitution but lied about how she got to the Paris hotel, and the fact that Defendant drove
6  to the Gold Key shops nearby while Villasana was inside the hotel.[10] Sergeant Hibbetts testified that
7  all of this information constituted probable cause to arrest Defendant for the charge of aiding and
8  abetting prostitution, a misdemeanor offense in Nevada. Hearing Tr. (7/6/2015) at 11:23 a.m.-11:24
9  a.m.; 11:32-11:33 a.m.; 11:39 a.m.-11:40 a.m.

### C.  Testimony of Detective Novotni

Detective Novotni testified that he had seen a picture of Defendant prior to the operation on October 6, 2014. Hearing Tr. (7/6/2015) at 11:53 a.m. On October 6, 2014, during the operation, his job was to conduct surveillance. Hearing Tr. (7/6/2015) at 11:52 a.m. He observed the Infiniti vehicle, which appeared to be the same vehicle as the one identified in the picture provided to Sergeant Hibbetts by USSS, approach the Paris hotel. Hearing Tr. (7/6/2015) at 11:52 a.m. Villasana[11] got out of the vehicle at the curbside, and the vehicle continued on to the Gold Key shops. Hearing Tr. (7/6/2015) at 11:53 a.m.; 12:00 p.m. Detective Novotni followed the vehicle down Las Vegas Boulevard to the Gold Key shops without losing sight of it. Hearing Tr. (7/6/2015) at 10:48 a.m. During this time, he visually determined that Defendant was the person driving the vehicle, and identified Defendant in court as the person that he observed driving the vehicle.

---

[9] Sergeant Hibbetts testified that he did not expect the patrol officers to engage in a felony stop, which is a controlled situation and involves using lights to stop them, issuing verbal commands to separate the person from the situation the person is in, and the stopping officer drawing their guns. Instead, this incident involved contact over a misdemeanor, and would not involve drawn guns. Hearing Tr. (7/6/2015) at 11:46 a.m.-11:47 a.m.

[10] Sergeant Hibbetts testified that it is common for a pimp or someone providing transportation to a prostitute to drive a short distance and wait for the prostitute to finish working, then either return to pick the prostitute up or meet the prostitute somewhere between where the act occurred and where the driver was waiting. Hearing Tr. (7/6/2015) at 11:40 a.m.

[11] Detective Novotni had had prior contact with Villasana. He had assisted in her prior prostitution arrest. Hearing Tr. (5/6/2015) at 1:58-2:00 p.m.

- 5 -

Hearing Tr. (7/6/2015) at 11:54 a.m. Detective Novotni did not remain at the Gold Key shops very long. He returned to the Paris and, after Villasana's arrest, returned to the Gold Key shops after Sergeant Hibbetts directed him to do so. Hearing Tr. (7/6/2015) at 11:54 a.m.; 11:57 a.m. By the time he returned, Defendant was already outside his vehicle in custody. Hearing Tr. (7/6/2015) at 11:57 a.m.; 11:59 a.m. LMVPD Officer Cody Bunn told Detective Novotni that he had read Defendant his *Miranda* rights, and Detective Novotni and Officer Bunn spoke with Defendant at the Gold Key shops. Detective Novotni later spoke with Defendant at the jail. Hearing Tr. (7/6/2015) at 11:58 a.m.

### D. Testimony of Officer Bunn

Officer Bunn was on duty, in uniform on October 6, 2014, when he received a call over Dispatch that he and his partner, Officer Mark Bellinger, needed to make a stop on a vehicle on which Sergeant Hibbetts had probable cause on a subject for possibly aiding and abetting prostitution[12] at the Gold Key shops. Hearing Tr. (7/6/2015) at 12:11 p.m.-12:12 p.m.; 12:15 p.m. Officer Bunn proceeded to the location, found the vehicle they had been told to find, and proceeded with a normal car stop.[13] Hearing Tr. (7/6/2015) at 12:12 p.m. When the officers arrived, they parked their car behind Defendant's parked vehicle. Hearing Tr. (7/6/2015) at 11:28 a.m.[14] Officer Bunn testified that his patrol car blocked Defendant's car so that Defendant could not drive away during the stop. Hearing Tr. (7/6/2015) at 12:27 p.m. When asked what would happen if Defendant had tried to run, Officer Bunn testified that he did not know. Hearing Tr. (7/6/2015) at 12:27 p.m.

---

[12]Officer Bunn could not recall where he learned about the aiding and abetting prostitution charge. Initially, he believed Dispatch told him; however, when he reviewed the LVMPD CAD log that did not indicate the specific charge, he testified that Sergeant Hibbetts must have called and told him. Hearing Tr. (7/6/2015) at 12:28 p.m.-12:29 p.m.

[13]Officer Bunn testified that he had simply been told to make a stop, so he and his partner did not make a felony stop, which he defined as the police having their guns out, and pulling the subject out of the car and onto the ground. He testified that this stop was simply a regular stop, where he approached the car and made conversation with the driver. Officer Bunn did not recall receiving information regarding weapons over the radio. Hearing Tr. (7/6/2015) at 12:14 p.m.-12:15 p.m.

[14]LVMPD records indicate that the first patrol unit arrived at the Gold Key shops at 2:14:53 a.m. and the second one arrived at 2:25:07 a.m. Hearing Tr. (7/6/2015) at 11:29 a.m. *See also* Exhibit 5.

Officer Bunn approached the driver's side door while his partner approached the passenger's side door. Officer Bunn proceeded with his normal routine regarding a car stop–he proceeded to the driver's side door and asked Defendant if he had any drugs, weapons or knives on him.[15] Hearing Tr. (7/6/2015) at 12:13 p.m. Defendant put his hands in the air and said, "Don't get fucking crazy on me, I have a gun in my waistband." Hearing Tr. (7/6/2015) at 12:13 p.m.; 12:16 p.m. At that time, Defendant was still in his vehicle, and Officer Bunn testified that he had not placed him under arrest. Hearing Tr. (7/6/2015) at 12:14 p.m. Officer Bunn then opened the car door, and Defendant simultaneously exited the vehicle. Hearing Tr. (7/6/2015) at 12:13 p.m. Officer Bunn put Defendant's hands behind his back, cuffed him, and retrieved the concealed firearm from his waistband. Hearing Tr. (7/6/2015) at 12:16 p.m. Defendant was arrested for several offenses, and Officer Bunn transported him to custody. Hearing Tr. (7/6/2015) at 12:18 p.m.

Officer Bunn initially testified that he did not provide Defendant with *Miranda* warnings. Hearing Tr. (7/6/2015) at 12:20 p.m. After refreshing his recollection with the police report, Officer Bunn testified that he did, in fact, provide *Miranda* warnings, and that Defendant acknowledged that he understood the warnings.[16] Hearing Tr. (7/6/2015) at 12:20 p.m.-12:23 p.m. Officer Bunn further testified that Defendant told him he wanted his girlfriend to come pick up his car. Hearing Tr. (7/6/2015) at 12:24 p.m. This statement was not in response to any question. Hearing Tr. (7/6/2015) at 12:24 p.m. Instead, it appeared to Officer Bunn that Defendant asked if his girlfriend could pick up his car so it would not get towed because Defendant knew he was going to be arrested. Hearing Tr. (7/6/2015) at 12:24 p.m.

. . . .

. . . .

. . . .

---

[15] Officer Bunn testified that he asks everyone this question during car stops. He asks the question to get the person's mind off the fact that there is a police officer at his/her car door, and to let them know that he wonders if the person has weapons or drugs. He also asks the question for officer safety during the car stop. Hearing Tr. (7/6/2015) at 12:13 p.m.-12:14 p.m.

[16] Officer Bunn, however, exhibited a vast lack of recollection regarding any of the circumstances surrounding the reading of the *Miranda* rights, including where he was, where Defendant was, and who else was present. Hearing Tr. (7/6/2015) at 12:25 p.m.

## II. ANALYSIS

### A. Credibility of Witnesses

The Court ordered an evidentiary hearing because the facts presented in the parties' briefing contradicted each other. "The longstanding and repeated invocations in caselaw of the need of district courts to hear live testimony so as to further the accuracy and integrity of the factfinding process are not mere platitudes. Rather, live testimony is the bedrock of the search for truth in our judicial system." *United States v. Thoms*, 684 F.3d 893, 903 (9th Cir. 2012). "[J]udges simply cannot decide whether a witness is telling the truth on the basis of a paper record and must observe the witnesses' demeanor to best ascertain their veracity - or lack thereof." *Oshodi v. Holder*, 729 F.3d 883, 892 (9th Cir. 2013) (internal citation omitted). *See also See United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000) (evidentiary hearing required where defendant demonstrates that a significant disputed factual issue exists); *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995) ("There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness's credibility").

During the evidentiary hearing in this matter, the Court had the opportunity to listen to the testimony of all witnesses, to observe and evaluate each witness' demeanor while testifying, and to weigh each witness' credibility. Having done so, the Court finds the witnesses who testified did so credibly.

### B. Fourth Amendment - *Terry*

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S.CONST.AMEND. IV. Since warrantless searches and seizures are *per se* unreasonable, the government bears the burden of showing that a warrantless search and seizure falls within an exception to the Fourth Amendment's warrant requirement. *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012). Evidence obtained in violation of the Fourth Amendment, including any "fruit of the poisonous tree," must be suppressed. *Id*.

Defendant submits that his stop violated the Fourth Amendment and, therefore, all evidence that flowed as a result of the stop should be suppressed. Docket No. 33 at 3-5.

A "suspicious individual may be briefly stopped and detained for the purposes of limited inquiry and weapons frisk . . ." *Terry v. Ohio*, 392 U.S. 1, 22 (1968). Such detention requires the officers possess reasonable suspicion that the suspect is engaging in criminal activity. *See Adams v. Williams*, 407 U.S. 143, 146 (1978).

In determining whether officers possessed sufficient information to have reasonable suspicion that Defendant engaged in criminal activity, courts may aggregate the personal facts known to each of the officers when the officers are working as a team, pursuant to the "collective knowledge doctrine." *United States v. Ramirez*, 473 F.3d 1026, 1032-33 (9th Cir. 2007).[17] Under the doctrine, courts determine whether probable cause or reasonable suspicion existed based on the collective knowledge of all officers involved in the criminal investigation, even if that information is not communicated to the arresting officer. *Id.* at 1031 (citing *United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir. 1986)).

The Ninth Circuit applies the collective knowledge doctrine in two situations. *Ramirez*, 473 F.3d at 1032. The first situation is where "law enforcement agents are working together in an investigation but have not explicitly communicated the facts each as independently learned." *Id.* Under this application of the collective knowledge doctrine, the Ninth Circuit has aggregated the facts known to each officer involved "when there has been communication among agents." *Id.*; *accord United States v. Jensen*, 425 F.3d 698, 704-06 (9th Cir. 2005); *United States v. Sandoval-Venegas*, 292 F.3d 1101, 1105 (9th Cir. 2002); *United States v. Del Vizo*, 918 F.2d 821, 826 (9th Cir. 1990). However, actual information regarding the challenged event need not be communicated. *United States v. Bertrand*, 926 F.2d 838, 844 (9th Cir. 1991); *see also United States v. Bernard*, 623 F.2d 551, 560-61 (9th Cir. 1980). Here, the requirement of communication is simply to "distinguish [] officers functioning as a team from officers acting as independent actors who merely happen to be investigating the same subject." *United States v. Terry*, 400 F.3d 575, 581 (8th Cir. 2005); *see also Bernard*, 623 F.2d at 561.

---

[17]The "collective knowledge doctrine" applies both to evaluating whether reasonable suspicion existed and whether probable cause existed. *See Ramirez*, 473 F.3d at 1032-33.

       The second situation in which the collective knowledge doctrine applies is when "an officer (or team of officers), with direct personal knowledge of all the facts necessary to give rise to reasonable suspicion or probable cause, directs or requests that another officer, not previously involved in the investigation, conduct a[n] . . . arrest." *Ramirez*, 473 F.3d at 1033. When one officer directs another to take some action "there is necessarily a 'communication' between those officers, and they are necessarily functioning as a team." *Id*. at 1036. As a result, the commanding officer does not need to convey information regarding why the suspect should be seized, and the resulting arrest does not violate the Fourth Amendment. *Id*.

       An investigatory stop does not violate the Fourth Amendment "if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30). Determining reasonable suspicion requires considering the totality of the circumstances, and "all relevant factors must be considered in the reasonable suspicion calculus-even those factors that, in a different context, might be entirely innocuous." *United States v. Fernandez-Castillo*, 324 F.3d 1114, 1117 (9th Cir. 2003) (quoting *United States v. Arvizu*, 534 U.S. 266, 277-78 (2002)). The Ninth Circuit defines reasonable suspicion as "'specific, articulable facts' which together with 'objective and reasonable' inferences, form a basis for suspecting that a particular person is engaged in criminal conduct." *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000) (quoting *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989)). Reasonable suspicion may depend on an officer's personal experience and special training to make inferences and deductions, as long as the conclusions are reasonable. *United States v. Montero-Camargo*, 208 F.3d 1122, 1131 (9th Cir. 2000) (citing *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

       Further, officers are allowed to take protective measures while conducting an investigatory stop. For example, "it is well established that an officer effecting a lawful traffic stop may order the driver and the passengers out of a vehicle." *United States v. Williams*, 419 F.3d 1029, 1030 (9th Cir. 2005) (citing *Maryland v. Wilson*, 519 U.S. 408, 410 (1997)). The inconvenience on the person being asked to leave their vehicle has been described as "*de minimis*," especially when weighed against legitimate concerns for officer safety. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977).

1   Likewise, "[p]olice officers are entitled to employ reasonable methods to protect themselves and
2   others in potentially dangerous situations." *United States v. Willis*, 431 F.3d 709, 717 (9th Cir. 2005)
3   (holding police could, within reason, question a defendant about possessing weapons during
4   investigatory stop) (quoting *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056-57 (9th Cir. 1995)).

5   Here, the officers who arrested Defendant had a reasonable suspicion to conduct an
6   investigatory stop. The collective knowledge doctrine applies, allowing the knowledge of
7   Defendant's status as someone with a propensity for pimping, who had a prior weapons arrest and
8   was a felon, along with Detective Novotni's observations in front of the hotel and during his
9   surveillance to be imputed to the officers who conducted Defendant's investigatory stop. *Ramirez*,
10  473 F.3d at 1032-33. However, even if all Sergeant Hibbetts knew was that Defendant was observed
11  dropping off a woman later arrested for prostitution, knowledge of such "specific facts" would give
12  rise to "objective and reasonable" inferences Defendant was engaging in criminal activity. *Thomas*,
13  211 F.3d at 1189. Under the collective knowledge doctrine, Sergeant Hibbetts properly directed the
14  patrol officers to conduct an investigatory stop of Defendant.

15  There is "no bright line rule for determining when an investigatory stop crosses the line and
16  becomes an arrest." *United States v. Parr*, 843 F.2d 1228, 1231 (9th Cir. 1988) (quoting *United*
17  *States v. Hatfield*, 815 F.2d 1068, 1070 (6th Cir. 1987)). Rather, whether a police detention is an
18  arrest or an investigatory stop is a fact-specific inquiry, *Washington v. Lambert*, 98 F.3d 1181, 1185
19  (9th Cir. 1996), guided by the general Fourth Amendment requirement of reasonableness, *Texas v.*
20  *Brown*, 460 U.S. 730, 739 (1983). The Court must consider "all the circumstances surrounding the
21  encounter" between the individual and the police, *Florida v. Bostick*, 501 U.S. 429, 439 (1991), "by
22  evaluating not only how intrusive the stop was, but also whether the methods used [by police] were
23  reasonable given the specific circumstances," *Lambert*, 98 F.3d at 1185.

24  Whether an arrest has occurred "depends on all of the surrounding circumstances, including
25  the extent that freedom of movement is curtailed and the degree and type of force or authority used
26  to effectuate the stop." *United States v. Harrington*, 636 F.2d 1182, 1186 (9th Cir. 1981) (citation
27  omitted). The question is whether, under all of the circumstances, "a reasonable person would
28  conclude he was under arrest." *Id*. Further, the fact that Sergeant Hibbetts testified that he had

probable cause to arrest Defendant prior to having Dispatch send patrol officers to his location does not make the stop of Defendant into an arrest. Whether or not Defendant's detention was an arrest or an investigatory stop depends on what the officers did, not on how they characterize what they did or believed they had probable cause to do. *Gallegos v. City of Los Angeles*, 308 F.3d 987, 992 (9th Cir. 2002).

Here, the uncontroverted testimony clearly showed that Officer Bunn and his partner approached Defendant's vehicle without guns drawn, and without ordering Defendant out of the vehicle. Officer Bunn asked Defendant one question–whether he had drugs, guns or weapons–and Defendant responded that he had a gun. Only after Defendant stated that he had a gun did Officer Bunn handcuff Defendant, retrieve the gun and place him under arrest for a felony offense.

Defendant argues that he was under arrest as soon as the patrol cars pulled up to the Gold Key shops and parked behind him, thereby preventing him from driving away. The Court disagrees. The Ninth Circuit has held that much more significant restrictions have not turned a stop into an arrest. "A brief but complete restriction of liberty, if not excessive under the circumstances, is permissible during a *Terry* stop and does not necessarily convert the stop into an arrest." *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982); *see also United States v. Parr*, 843 F.2d 1228, 1231 (9th Cir.1988) (a *Terry* stop is not transformed into a *de facto* arrest when a defendant is moved from the street to the back of a police car). Further, an investigative stop is not transformed into an arrest merely because the police use force in handling the suspect. *See, e.g., United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir.1987) (suspects not arrested when ordered to get out of their car and lie down on pavement); *United States v. Jacobs*, 715 F.2d 1343, 1345–46 (9th Cir.1983) (*per curiam*) (same).

More significantly, the Ninth Circuit has specifically held that the blocking of a defendant's car by law enforcement agents does not turn an investigatory stop into an arrest. *United States v. Patterson*, 648 F.2d 625, 633 & n.24 (9th Cir. 1981) ("an otherwise valid stop is not inevitably rendered unreasonable merely because the suspect's car was boxed in by police cars in order to prevent it from being moved" (quoting 3 W. LaFave, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT (1978), at 30)). "A valid stop is not transformed into an arrest merely because

1 law enforcement agents momentarily restrict a person's freedom of movement. They may impose
2 such a restriction to maintain the status quo while making an initial inquiry, provided the force
3 displayed is not excessive under the circumstances." *Id*.; *see also United States v. Gomez*, 642 F.2d
4 1124, 1126-27 (9th Cir. 1981). A contrary result "would leave agents powerless to perform their
5 investigative functions without the cooperation of suspects." *Patterson*, 648 F.2d at 633.

6       In *Patterson*, the Court held that blocking the suspect's car for the investigatory stop was a
7 reasonable precaution to ensure that the inquire would not be terminated prematurely. *Id*. The Court
8 further held that blocking the car in combination with ordering the suspect out of the car did not
9 transform the stop into an arrest, as "the force used was not excessive and the innocent person could
10 not reasonably have assumed he was being taken into custody indefinitely. The stop was not an
11 arrest." *Id*. at 634. Likewise, this Court finds that the blocking of Defendant's car in the instant case
12 did not constitute excessive force for an investigatory stop, and that the stop did not ripen into an
13 arrest until after Defendant admitted that he had a firearm in his waistband. At that time, Officer
14 Bunn had probable cause to arrest Defendant for a felony offense. Defendant's arrest was legal;
15 therefore, the evidence obtained from that arrest should not be suppressed. Accordingly, the Court
16 recommends **DENYING** Defendant's motion to suppress his stop and any evidence that flowed as
17 a result of the stop, including the firearm and statements (except as otherwise recommended below).

18       **C.**    **Fifth Amendment -** *Miranda*

19       Defendant also asks this Court to suppress his statements because the United States has failed
20 to show that Defendant received his *Miranda* rights and made a voluntary, knowing and intelligent
21 waiver of those rights. *Id*. at 8-9.

22       Interrogation initiated by law enforcement officers after a suspect "has been taken into
23 custody or otherwise deprived of his freedom of action in any significant way" must be preceded by
24 *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *accord United States v. Wilson*,
25 666 F.2d 1241, 1246 (9th Cir. 1982). "In order to combat [the pressures inherent in custodial
26 interrogation] and to permit a full opportunity to exercise the privilege against self-incrimination,
27 the accused must be adequately and effectively apprised of his rights." *United States v. Williams*,
28 435 F.3d 1148, 1151 (9th Cir. 2006) (quoting *Miranda*, 384 U.S. at 467).

The "touchstone" for *Miranda* warnings is whether the suspect is in custody when interrogated. *United States v. Barnes*, 713 F.3d 1200, 1205 (9th Cir. 2013) (citing *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)). To determine whether an individual was in custody, the test is whether "a reasonable innocent person in such circumstances would conclude after brief questioning [that] he or she would not be free to leave." *United States v. Bassignani*, 575 F.3d 879, 883-84 (9th Cir. 2009) (quoting *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir.1981)). A *Miranda* warning functions both to reduce the risk that an involuntary or coerced statement will be admitted at trial and to implement the Fifth Amendment's self-incrimination clause. *Id*. at 1151. Thus, if a suspect in custody does not receive an adequate warning effectively apprising him of his rights before he incriminates himself, his statements may not be admitted as evidence against him. *Id*. at 1152. Here, Defendant made three statements. The Court analyzes each statement in turn.

### 1. Defendant's Pre-Arrest Statement

The Court has already found, above, that Defendant was not in custody when he made his initial statement to Officer Bunn, wherein he told Officer Bunn that he had a firearm in his waistband. Because Defendant was not yet under arrest or in custody, *Miranda* warnings were not necessary at that time.[18] Since *Miranda* warnings were not necessary at that point, Defendant's statement about the firearm in his waistband was not made in violation of his *Miranda* rights.

---

[18]Even if Defendant had been in custody at the time of his statement about possessing a gun, however, the public safety exception to the *Miranda* requirement applies. In determining whether the public safety exception to *Miranda* applies, "we ask whether there was an objectively reasonable need to protect the police or the public from any immediate danger." *United States v. Carrillo*, 16 F.3d 1046, 1049 (9th Cir. 1994), as amended (May 17, 1994) (citing *United States v. Brady*, 819 F.2d 884, 888 n. 3 (9th Cir. 1987) (quoting *New York v. Quarles*, 467 U.S. 649, 659 (1984)). Application of the public safety exception is particularly appropriate when the officer's questions are not designed to elicit an incriminating response. *Allen v. Roe*, 305 F.3d 1046, 1050 (9th Cir. 2002).

Here, it was objectively reasonable for the officer to ask Defendant if he was in possession of drugs, guns or weapons. The officers approached Defendant in a public setting, in a nonaggressive manner. After approaching Defendant's vehicle, Officer Bunn asked if he possessed drugs, guns or weapons to ensure officer safety. Further, after Defendant admitted to possessing a firearm, Officer Bunn did not continue to ask Defendant questions about the firearm or any other incriminating questions. Therefore, even if Defendant had been in custody at the time of this pre-arrest statement, the Court finds that the public safety exception applies.

Accordingly, the Court recommends **DENYING** Defendant's request to suppress this statement.

### 2. Defendant's Post-Arrest Statements

The Court has already determined that, after Defendant made his pre-arrest statement, Officer Bunn placed handcuffs on him, retrieved the firearm from his waistband, and placed him under arrest. Defendant was, therefore, in custody from then on, and *Miranda* warnings were required for any interrogation.

Defendant's statements made after he was in custody may only be allowed into evidence if he was properly informed of his *Miranda* rights, and waived them. The government has the burden of proving, by a preponderance of the evidence, that the defendant has voluntarily, knowingly, and intelligently waived his *Miranda* rights. *See Colorado v. Spring*, 479 U.S. 564, 573 (1987); *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). The government satisfies its burden if it makes two prerequisite showings. First, the waiver must have been voluntary in that it was the product of "a free and deliberate choice rather than coercion or improper inducement." *United States v. Shi*, 525 F.3d 709, 728 (9th Cir. 2008) (quoting *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998)). Second, the waiver must have been made "knowingly" and "intelligently." *Miranda*, 384 U.S. at 444. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude the *Miranda* rights have been waived. *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see also Shi*, 525 F.3d at 727-728.

An admission "is involuntary if coerced either by physical intimidation or psychological pressure." *Shi*, 525 F.3d at 730 (quoting *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003)). Courts look to see "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." *Mickey v. Ayers*, 606 F.3d 1223, 1233 (9th Cir. 2010) (quoting *Dickerson v. United States*, 530 U.S. 428, 434, (2000)). When assessing the voluntariness of an admission, courts consider "the totality of all the surrounding circumstances-both the characteristics of the accused and the details of the interrogation." *Id*. (quoting *Dickerson*, 530 U.S. at 434); *see also Shi*, 525 F.3d at 730.

1   Under the circumstances of this case, the Court cannot find that Defendant voluntarily,
2 knowingly and intelligently waived his *Miranda* rights. Officer Bunn initially failed to recall even
3 reading Defendant his *Miranda* rights. When his recollection was refreshed and he recalled reading
4 the rights, he failed to recall the circumstances surrounding the reading of the rights and Defendant's
5 waiver. Hearing Tr. (7/6/2015) at 12:25 p.m. The Court, therefore, simply cannot make a
6 determination regarding the totality of all the surrounding circumstances in order to determine
7 whether Defendant's waiver was valid. The Court, therefore, finds that Defendant did not
8 voluntarily, knowingly and intelligently waive his *Miranda* rights.

9   Next, the Court must determine if Defendant's statements were the product of interrogation.
10 Officer Bunn testified that Defendant spontaneously made the statement that he wanted his girlfriend
11 to come pick up his car. Hearing Tr. (7/6/2015) at 12:24 p.m. Officer Bunn clearly testified that this
12 statement was not in response to any question. Hearing Tr. (7/6/2015) at 12:24 p.m. Instead,
13 knowing he was going to be arrested, Defendant asked if his girlfriend could pick up his car so it
14 would not get towed. Hearing Tr. (7/6/2015) at 12:24 p.m. This testimony was uncontroverted.
15 Therefore, since Defendant's statement regarding having his girlfriend pick up his vehicle was not
16 made in response to custodial interrogation, the Court recommends that Defendant's request to
17 suppress it be **DENIED**.

18   Defendant asks the Court to suppress one final statement. After he was taken into custody
19 and transported to the jail, he alleges that, in response to interrogation by Detective Novotni, he
20 stated that he did not want to speak, that he knew nothing about the gun, and that he never dropped
21 Villasana off at the Paris Hotel. Docket No. 33 at 7. Although the government alleges in its papers
22 that this statement was spontaneous, no evidence of such was presented to the Court during the
23 evidentiary hearing. Instead, Detective Novotni testified that he was told Officer Bunn read
24 Defendant his *Miranda* rights, and that he spoke to Defendant at the Gold Key shops and later that
25 night. The Court, therefore, cannot make a determination as to whether the statement was made
26 spontaneously or in response to interrogation, or as to the surrounding circumstances regarding the
27 statement. Therefore, the Court recommends that Defendant's request to suppress this statement be
28 **GRANTED**.

**RECOMMENDATION**

Based on the foregoing and good cause appearing therefore,

IT IS RECOMMENDED that Defendant's Motion to Suppress Evidence, Docket No. 33, be **GRANTED** in part and **DENIED** in part.

IT IS FURTHER RECOMMENDED that Defendant's request to suppress his stop and arrest and all evidence obtained as a result, including the firearm, be **DENIED**.

IT IS FURTHER RECOMMENDED that Defendant's request to suppress his pre-arrest statement that he had a gun in his waistband be **DENIED**.

IT IS FURTHER RECOMMENDED that Defendant's request to suppress his post-arrest statement that he wanted his girlfriend Villasana to pick up his vehicle be **DENIED**.

IT IS FURTHER RECOMMENDED that Defendant's request to suppress his post-arrest statement that he did not want to talk to police, knew nothing about the gun, and did not drop Villasana off at the Paris Hotel be **GRANTED**.

**NOTICE**

Pursuant to Local Rule IB 3-2 **any objection to this Report and Recommendation must be in writing and filed with the Clerk of the Court within 14 days of service of this document.** The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This Circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 10th day of July, 2015.

_____
NANCY J. KOPPE
United States Magistrate Judge